IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 06-00594-SOM-4 |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING DEFENDANT |
| | ) | CHRISTOPHER NIU'S MOTION FOR |
| | ) | COMPASSIONATE RELEASE |
| | ) | |
| vs. | ) | |
| | ) | |
| CHRISTOPHER NIU, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANT CHRISTOPHER NIU'S
MOTION FOR COMPASSIONATE RELEASE**

**I.        INTRODUCTION.**

In January 2008, this court sentenced Defendant

Christopher Niu to 225 months of imprisonment and five years of

supervised release.  Niu had entered a guilty plea to one count

of conspiring to distribute and possess with intent to distribute

50 grams or more of methamphetamine, in violation of 21 U.S.C.

§§ 841(a)(1), 841(b)(1)(A), and 846.  *See* Judgment in a Criminal

Case, ECF No. 202.  Niu was responsible for 3.4942 kilograms of

actual methamphetamine.  *See* Pretrial Investigation Report at 6

ECF No. 203; ECF No. 199 (adopting Pretrial Investigation

Report); Sentencing Transcript at 9, ECF No. 275-1, PageID

# 1258; Memorandum of Plea Agreement, ECF No. 167, PageID # 500.

Niu has served a little more than 13.5 years of his

18.75-year sentence.  *See* ECF No. 269-7.  Assuming good time

credit, his projected release date is May 17, 2022.  Niu is

currently incarcerated at FCI Lompoc, in Lompoc, California.  *See* https://www.bop.gov/inmateloc/ (input Register Number 90229-111) (last visited October 19, 2020).  FCI Lompoc houses 954 inmates. *See* https://www.bop.gov/locations/institutions/lof/ (last visited October 19, 2020).

As of the morning of October 19, 2020, FCI Lompoc has no inmate COVID-19 cases and has 3 active staff COVID-19 cases. FCI Lompoc previously had a large COVID-19 problem.  This is seen in the number of those who have "recovered" from COVID-19 (734 inmates and 16 staff members).  Two inmates died from COVID-19. *See* https://www.bop.gov/coronavirus/index.jsp (last visited October 19, 2020).

Niu is 45 years old and reports heart disease (atrial fibrillation and secondary cardiomyopathy), is morbidly obese, and suffers from sleep apnea, hypertension, unspecified asthma, kidney disease, and gout.  These conditions are reflected in the sealed medical records submitted to this court.  *See* ECF No. 272, PageID #s 1022-23, 1027, 1033, 1055.

On May 5, 2020, Niu tested positive for SARS-CoV-2, the virus that causes Covid-19.  *Id.*, PageID # 1215; https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html (indicating that SARS-CoV-2 is the virus that causes Covid-19) (last visited October 19, 2020).  Niu says that he exhibited no symptoms.  *See* ECF No. 269, PageID #978.

II.        **ANALYSIS.**

Niu's compassionate release request is governed by 18

U.S.C. § 3582(c)(1)(A), which provides:

> [T]he court . . . upon motion of the
> defendant after the defendant has fully
> exhausted all administrative rights to appeal
> a failure of the Bureau of Prisons to bring a
> motion on the defendant's behalf or the lapse
> of 30 days from the receipt of such a request
> by the warden of the defendant's facility,
> whichever is earlier, may reduce the term of
> imprisonment (and may impose a term of
> probation or supervised release with or
> without conditions that does not exceed the
> unserved portion of the original term of
> imprisonment), after considering the factors
> set forth in section 3553(a) to the extent
> that they are applicable, if it finds that--
>
> (i) extraordinary and compelling reasons
> warrant such a reduction . . . .
>
> and that such a reduction is consistent with
> applicable policy statements issued by the
> Sentencing Commission.

In other words, for the court to exercise its authority under

§ 3582(c)(1)(A), it must (1) find that the defendant exhausted

his administrative remedies or that 30 days have passed since he

filed an administrative compassionate relief request; (2) also

find, after considering the factors set forth in section 3553(a),

that extraordinary and compelling reasons warrant a sentence

reduction; and (3) find that such a reduction is consistent with

the Sentencing Commission's policy statements. *United States v.*

*Scher*, 2020 WL 3086234, at *2 (D. Haw. June 10, 2020).

### A.   Niu Has Satisfied the Exhaustion Requirement of 18 U.S.C. § 3582(c)(1)(A).

Niu submitted an administrative compassionate release request to the warden of his prison on June 25, 2020.  On July 24, 2020, the warden denied his request.  *See* ECF No. 269-8, PageID #s 1006.  The Government concedes that Niu has satisfied the exhaustion requirement.  *See* ECF No. 275, PageID # 1241 ("United States believes that Defendant has exhausted his BOP administrative remedies.").  Accordingly, this court finds that Niu fulfilled the exhaustion requirement of § 3582(c)(1)(A).

### B.   Niu Has Demonstrated That Extraordinary and Compelling Circumstances Justify His Early Release.

This court turns to § 3582(c)(1)(A)'s second requirement: whether extraordinary and compelling reasons warrant a sentence reduction.  In orders addressing compassionate release motions in other cases, this court has expressly recognized that it possesses considerable discretion in determining whether a particular defendant has established the existence of extraordinary and compelling reasons that justify early release. This court has also stated that, in reading § 3582(c)(1)(A) as providing for considerable judicial discretion, the court is well aware of the absence of an amended policy statement from the Sentencing Commission reflecting the discretion now given to courts under that statute.  *See United States v. Scher,* 2020 WL 3086234, at *2 (D. Haw. June 10, 2020); *United States v.*

*Cisneros*, 2020 WL 3065103, at *2 (D. Haw. Jun. 9, 2020); *United States v. Kamaka*, 2020 WL 2820139, at *3 (D. Haw. May 29, 2020).

According to the CDC, a person's risk of a severe illness (one that may require hospitalization, intensive care, or a ventalator) from COVID-19 increases with age. The CDC website explains that "people in their 50s are at higher risk for severe illness than people in their 40s. Similarly, people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s. The greatest risk for severe illness from COVID-19 is among those aged 85 or older."

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited October 19, 2020).

The CDC currently lists the following conditions for people of any age as creating an increased risk of a severe illness from COVID-19:

    *Cancer

    *Chronic kidney disease

    *COPD (chronic obstructive pulmonary disease)

    *heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies

    *Immunocompromised state (weakened immune system) from solid organ transplant

    *Obesity (body mass index [BMI] of 30 kg/m2 or higher but < 40 kg/m2)

    *Severe Obesity (BMI = 40 kg/m2)

    *Sickle cell disease

*Smoking

*Type 2 diabetes mellitus

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/
people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fw
ww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fg
roups-at-higher-risk.html (last visited October 19, 2020).

The CDC also lists the following as possibly increasing the risk of a severe illness from COVID-19:

*Asthma (moderate-to-severe)

*Cerebrovascular disease (affects blood vessels and blood supply to the brain)

*Cystic fibrosis

*Hypertension or high blood pressure

*Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines

*Neurologic conditions, such as dementia

*Liver disease

*Overweight (BMI > 25 kg/m2, but < 30 kg/m2)

*Pregnancy

*Pulmonary fibrosis (having damaged or scarred lung tissues)

*Thalassemia (a type of blood disorder)

*Type 1 diabetes mellitus

*Id.*

6

The CDC notes that "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *Id.* Niu's medical conditions (heart disease, morbid obesity, sleep apnea, hypertension, unspecified asthma, kidney disease, and gout) place him at risk of a severe illness if he contracts COVID-19. But that does not end the analysis.

Niu is housed at FCI Lompoc. There is no dispute that, early in the COVID-19 pandemic, the virus spread rapidly through FCI Lompoc, with 734 inmates of the current 954 inmates (76.9%) and 16 members of the staff having contracted and recovered from COVID-19. Two inmates have died as a result of being infected. However, as of the morning of October 19, 2020, there are no active inmate cases at FCI Lompoc and only 3 positive staff tests (with those individuals most likely not going to work). Whether that reduction is because many inmates now have immunity, because the facility is doing better at controlling the spread, or (of greater concern) because the facility is failing to detect new cases, this court at this point has a record that is far less serious than it would have been earlier. The court nevertheless considers the serious history at FCI Lompoc and the risk that Niu might be exposed again to COVID-19 and might suffer serious complications.

Because the parties offered conflicting accounts of the

prison's present conditions, this court deferred ruling on this
motion until it could review an expert report by Dr. Homer
Venters summarizing the current state of the Lompoc complex
COVID-19 outbreak in *Torres v. Milusnic*, No. CV. 20-4450 CBM
(C.D. Cal.).  Dr. Venters filed that report on September 25,
2020.  *See* ECF No. 278-1 (copy of report filed in this case).
Dr. Venters called the COVID-19 outbreak at the Lompoc complex
"one of the nation's most overwhelming."  *Id.*, PageID # 1303.

Venters paints a picture of inconsistency.  What he was
told by BOP staff sometimes differed greatly from what he was
told by inmates at FCI Lompoc.  For example, according to staff,
no inmates had ongoing symptoms from COVID-19.  *Id.*, PageID
# 1306.  However, a quarter of the inmates Venters spoke with at
FCI Lompoc said they were still experiencing such symptoms,
including shortness of breath, painful breathing, headaches,
ringing in the ears, and weakness.  *Id.*, PageID # 1309.

With respect to FCI Lompoc's medical facilities, staff
told Venters that the "sick call" response time was within one
day.  *Id.*, PageID # 1306.  The inmates disagreed with that
statement, telling Venters that "sick call requests often go
unanswered and when they are seen, it is most often more than a
week after reporting a medical problem," sometimes taking several
weeks.  *Id.*, PageID # 1309.

While Venters saw that paper towels were available to

inmates and most of the staff wore masks, *id.*, PageID # 1308-09,
inmates told Venters that paper towels only became available
right before his visit and staff use of masks was inconsistent,
with less use during night and weekend shifts.  *Id.*, PageID
# 1310-11.

Venters noted that the Lompoc complex took some
positive steps to address COVID-19, such as screening staff well
and maintaining a good hospital unit and screening database.
*Id.*, PageID # 1320.

Reading the Venters report as a whole, and considering
the lack of any active inmate cases of COVID-19 in FCI Lompoc
right now, the court does not see Niu as being in immediate
danger of contracting COVID-19.  Nevertheless, the possibility
that he will be exposed to the virus in the future cannot be
ignored.

There is some evidence in the record that suggests that
Niu's risk of contracting COVID-19 might be mitigated.  Most
notably, Niu tested positive for COVID-19 in May 2020 and does
not claim to have had a severe case of the disease.  That raises
two issues.

First, if he did not develop complications during his
May infection, it might be that he will not likely develop
complications even if reinfected.  *See* Richard L. Tillett, et al,
*Genomic Evidence for Reinfection with SARS-CoV-2: a Case Study*,

Oct. 12, 2020,

https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(20)30764-7/fulltext (noting that, in a reinfection of a Nevada man, his symptoms were more severe, but also recognizing that in other cases of possible reinfection, there was no difference in the severity of symptoms).  There is no way for this court to know whether Niu's test was a false positive, but, if the test was accurate, it appears that Niu may have survived the virus without developing serious complications.

Second, as noted above, this court cannot conclude that there is a substantial risk that Niu will be reinfected.  As Niu notes, there is anecdotal evidence that a handful of people have been reinfected with COVID-19.  *See id.* (discussing a Nevada man who appears to have been reinfected with COVID-19); Nate Wood, *Nevada lab confirms 1st coronavirus reinfection in the US*, ABC News, Aug. 28, 2020,

https://abcnews.go.com/Health/nevada-lab-confirms-1st-coronavirus-reinfection-us/story?id=72691353 (same); Maura Hohman, *COVID-19 reinfection: Can you get coronavirus twice? What does reinfection mean?*, Today, Sept. 10, 2020,

https://www.today.com/health/covid-19-reinfection-can-you-get-coronavirus-twice-what-does-t190764 (reporting that 4 people have been reinfected).  For example, there are reports that "[a] Hong Kong man who was initially infected with the coronavirus in March

10

and made a full recovery was reinfected more than four months later after a trip abroad." Adam Taylor and Ariana Eunjung Cha, *First Coronavirus Reinfection Documented in Hong Kong, Researchers Say*, Washington Post, August 24, 2020, https://www.washingtonpost.comhealth/2020/08/24/coronavirus-reinfection-hong-kong/. The CDC recognizes that it has "limited information about reinfections." https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html (last visited October 14, 2020). It says research is ongoing and that "[t]here are no confirmed reports to date of a person being reinfected with COVID-19 within 3 months of initial infection," indicating a 3-month period of possible immunity. *See id.*

New research continues to be done on the immunity issue. The Nevada patient described above had positive tests on April 18 and June 5, 2020. This interval may indicate that any immunity is even shorter than 3 months, although possibly that patient had "a case of continuous infection entailing deactivation and reactivation." *See Genomic Evidence for Reinfection with SARS-CoV-2: a Case Study*, Oct. 12, 2020. In any event, even if reinfection is possible, it appears to be extremely rare, as reinfections have been reported only a few times in the millions of cases to date. *See* https://www.worldometers.info/coronavirus/?utm_campaign=homeAdveg

11

as1? (reporting more than 39 million cases worldwide) (last
visited October 15, 2020);

https://www.bbc.com/news/world-51235105 (reporting about 38.5
million cases worldwide) (last visited October 15, 2020);

https://abcnews.go.com/Health/nevada-lab-confirms-1st-coronavirus
-reinfection-us/story?id=72691353.

        If individuals have at least some immunity against
future infection, the strength and length of that immunity have
not been established and may be brief.  *See*

https://www.nytimes.com/2020/08/14/world/covid-19-coronavirus.htm
l#link-10cd68e7 (last visited October 15, 2020); *see also* Apoorva
Mandavilli, *You May Have Antibodies After Coronavirus Infection.
But Not for Long*, N.Y. Times, June 18, 2020,

https://www.nytimes.com/2020/06/18/health/coronavirus-antibodies.
html (indicating that COVID-19 antibodies may only last 2 to 3
months) (last visited October 15, 2020).

        However, other articles have indicated that individuals
infected with COVID-19 are likely to remain immune even after
their antibody count drops.  These articles indicate that the
body might retain immunological memory that allows it to quickly
produce new antibodies to respond to a second infection.
Additionally, the remaining antibodies might even be sufficient
to fight off COVID-19.  "A decline in antibodies is normal after
a few weeks, and people are protected from the coronavirus in

other ways." Apoorva Mandavilli, *Can You Get COVID-19 Again?*
*It's Very Unlikely, Experts Say*, N.Y. Times, July 22, 2020,
https://www.nytimes.com/2020/07/22/health/covid-antibodies-herd-i
mmunity.html; *see also* Martin Finucane, *Here's What You Need To*
*Know About Fading Coronavirus Antibodies*, Boston Globe, July 23,
2020,
https://www.bostonglobe.com/2020/07/23/nation/heres-what-you-need
-know-about-fading-coronavirus-antibodies/.

        This court is acutely aware that, at this point, no one
completely understands how COVID-19 operates. In fact, the CDC
indicates that "more information is needed to know whether . . .
immune protection will be observed for patients with COVID-19."
https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html (click on
"Transmission" then "Can people who recover from COVID-19 be re-
infected with SARS-CoV-1?") (last visited October 14, 2020).
This court is in no position to make a definitive determination
about Niu's risk of reinfection. What the court does know is
that, as of today, there are no inmates in his facility with
active cases of COVID-19. Additionally, because 77.1% of the
inmate population at FCI Lompoc has already had COVID-19, those
inmates possibly now have some form of immunity to reinfection
such that another large-scale COVID-19 outbreak at the facility
may be less likely in the near future. *See* Cynthia DeMarco,
*COVID-19 Herd Immunity: 7 questions, answered*, July 17, 2020,

https://www.mdanderson.org/cancerwise/what-is-covid-19-coronaviru
s-herd-immunity-when-will-we-achieve-herd-immunity.h00-159383523.
html ("We probably need around 70% of the population to have
developed antibodies in order to halt community transmission of
COVID-19.").

Despite the uncertainties, in any evaluation of whether
there are extraordinary and compelling reasons warranting a
reduction in his sentence, this court can no more ignore the
possibility of immunity than it can ignore the possibility of
reinfection.

In addition to examining Niu's medical conditions and
potential immunity to COVID-19 in the course of determining
whether he has shown extraordinary and compelling reasons to
reduce his sentence, the court, pursuant to § 3582(c)(1)(A),
considers the factors set forth in § 3553(a).  That section
requires the court to impose a "sentence sufficient, but not
greater than necessary, to comply with the purposes set forth in
paragraph (2)" below:

> (1) the nature and circumstances of the
> offense and the history and characteristics
> of the defendant;
>
> (2) the need for the sentence imposed--
>     (A) to reflect the seriousness of the
> offense, to promote respect for the law, and
> to provide just punishment for the offense;
>     (B) to afford adequate deterrence to
> criminal conduct;
>     (C) to protect the public from further
> crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--
(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

15

(6) the need to avoid unwarranted sentence
disparities among defendants with similar
records who have been found guilty of similar
conduct; and

(7) the need to provide restitution to any
victims of the offense.

18 U.S.C. § 3553(a).

Niu has served a substantial amount of his sentence and
is scheduled to be released on May 17, 2022.  His lengthy
sentence was a reflection of his managerial and supervisory role
in the distribution of multiple kilograms of actual
methamphetamine.  While the crime itself did not involve
violence, the Presentence Investigation Report indicates that Niu
threatened to "take care of" one courier if she ever told law
enforcement about his drug activities.  Niu also mentioned to his
buyer that he would have the person who tipped off law
enforcement about his drug activities "taken care of."

Niu's criminal history began when he was a juvenile.
He was adjudicated a delinquent and held by the California Youth
Authority for roughly 8 years.  That adjudication related to a
murder.  The court has little information about that matter, but
notes that it appears to have occurred when Niu was 15 years old.
*See* Transcript of [Sentencing] Proceeding, ECF No. 275-1, PageID
# 1262.  In 2001, two years after his release from the California
Youth Authority, Niu was arrested for possession of a controlled
substance for sale and was sentenced to 6 months of imprisonment.

16

Before his arrest, Niu had a number of plumbing and groundskeeper jobs.  While incarcerated, he earned his GED and took numerous educational courses, including an anger management course.  *See* ECF No. 269-5, PageID #s 995-96.  Niu is enrolled in the Residential Drug Alcohol Program and is the "Head Senior Guide of the mentorship in the program."  ECF No. 277-1, PageID # 1293.  The record does not indicate whether that program is ongoing or has been suspended during the pandemic.  Assuming Niu successfully completes the Residential Drug Alcohol Program and consequently becomes eligible to spend the end of his prison sentence in a halfway house, he might be out of a prison setting even before his May 2022 projected release date.  That is, even if the present motion were denied, he might not have much more time at FCI Lompoc.

Niu has not consistently been a model inmate.  Niu's most recent discipline was in August 2019 for possessing a cellular telephone and cash.  *See* ECF No. 269-6, PageID # 999.  Before that, he was disciplined in 2015 for giving/accepting money without authorization.  *Id.*, PageID # 1000.  He was also disciplined in 2012 for fighting, his only violent infraction in prison.  In 2009, he was disciplined for sleeping during a "fog count," and in 2008 for conducting business without authorization.  *Id.*

The court notes that the Judgment in this case requires

17

Niu to participate in substance abuse treatment (including drug
and alcohol testing), which is reassuring to this court.  *See* ECF
No. 202, PageID # 618.  Also reassuring to this court is the 5-
year supervised release period Niu faces.  If Niu reoffends
during that period, the court will be able to react appropriately
to protect the public.

Niu says that, if released, he plans to live with his
mother and son in California.  He says that his mother has
dementia and that he would take care of her.  He says that his
son has been employed by an airline for the last three years.
*See* ECF No., 269, PageID # 985.  Given the pandemic, Niu's son's
continued employment may be in jeopardy, but this court will not
speculate about that and instead assumes that Niu's son will be
able to support Niu financially if Niu is released.

Like many of the other compassionate release requests
this court has received during the COVID-19 pandemic, this court
considers this to be a difficult case.  Under § 3582(c)(1)(A),
only extraordinary and compelling reasons can justify a reduction
in an inmate's sentence.  Niu's medical conditions and positive
COVID-19 test are particularly worrisome.  Among other things, he
has heart disease and kidney disease, and weighs over 300 pounds.
He has a relatively short time remaining in prison, particularly
if he were to complete the residential substance abuse treatment
program and be released by the prison to a halfway house toward

the end of his prison sentence.  The record includes some instances of violent behavior: some possible involvement in a murder when he was 15, threats Niu made to "take care of" people who cooperated with law enforcement, and fighting in prison 8 years ago.  Putting all these circumstances together, and giving great weight to Niu's heart disease, this court concludes that it has an extraordinary and compelling reason to reduce Niu's sentence under § 3582(c)(1)(A) and that release would be consistent with Sentencing Commission policy statements.

## III.      CONCLUSION.

Niu's request for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is granted.

Niu's sentence is reduced to time served plus 3 days. (In other cases not involving movants who have contracted COVID-19, this court has reduced sentences to time served plus 15 days.) The 3-day period is intended to allow his family to make arrangements to transport him home from FCI Lompoc and to remove any guns from the residence.  Following the 3 days, Niu shall be released to begin his term of supervised release.

Niu faces a 5-year term of supervised release, and that term is substantial enough that the court orders no supplemental period of supervised release.

Niu must go directly from FCI Lompoc to his mother's residence.  That is, Niu must travel from FCI Lompoc to his

mother's home without stops, except as may be absolutely necessary.

Niu shall abide by all of the standard, mandatory, and special conditions of supervised release previously imposed, including the ban on firearms.  In addition, Niu must abide by the following additional special conditions:

> 4. You will be monitored by radio frequency technology for a period of 180 days, and you must follow the rules and regulations of the location monitoring program, pursuant to the Participant's Agreement.  You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the probation officer.  You shall earn leave as determined by the probation officer.  You must pay the costs of the program, as directed by the probation officer.

It is further ordered that, immediately upon his release from BOP custody, Niu report by telephone (808-541-1283) to Timothy Jenkins of the United States Probation Office, District of Hawaii, providing him with his address and any other information needed.  Mr. Jenkins's office will be contacting the appropriate United States Probation Office concerning supervision of Niu.

It is so ordered.

DATED: Honolulu, Hawaii, October 19, 2020.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*United States v. Niu*, Cr. No. 06-00594-SOM-4; ORDER GRANTING DEFENDANT CHRISTOPHER
NIU'S MOTION FOR COMPASSIONATE RELEASE